**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 24-2360, 24-2361, 24-2362, 24-2363, 24-2364
_____

TRUST UNDER THE TRUST OF CHARLES G.
BERWIND TRUST, F/B/O David M. Berwind, Jr., Valerie L.
Pawson, D. Michael Berwind, Jr., David M. Berwind III and
Richard D.R. Berwind, Trustees; TRUST UNDER THE
TRUST OF CHARLES G. BERWIND TRUST, F/B/O Linda
Berwind Shappy, Linda Berwind Shappy, Russsell F. Shappy,
Jr., and Dennis R. Delaney, Trustees; TRUST UNDER THE
TRUST OF CHARLES G. BERWIND TRUST, F/B/O Gail
Berwind Warden, Gail Berwind Warden, Duncan C. Warden
and Dennis R. Delaney, Trustees, all as successor trusts to the
Charles G. Berwind Trust,
Appellants in 24-2360

DUNCAN WARDEN; GAIL WARDEN,
Appellants in 24-2361

RUSSELL SHAPPY, JR.; LINDA B. SHAPPY,
Appellants in 24-2362

ESTATE OF DAVID M. BERWIND, Deceased, David
McMichael Berwind, Jr., Linda Berwind Shappy & Gail
Berwind Warden, Personal Representatives; ESTATE OF
JEANNE BERWIND, Deceased, Linda Berwind Shappy &
Gail Berwind Warden, Co-Personal Representative,

Appellants in 24-2363

D. MICHAEL BERWIND, JR.; CAROL R. BERWIND,
Appellants in 24-2364

v.

COMMISSIONER OF INTERNAL REVENUE
_____

On Appeal from the United States Tax Court
(Case Nos. 08-26218, 08-26219, 08-26220, 08-26221, 08-26222)
Tax Court Judge: Richard T. Morrison
_____

Argued May 21, 2025
_____

Before:  PHIPPS, CHUNG, and ROTH, <u>Circuit Judges</u>

(Filed October 30, 2025)

Gregory G. Garre **[ARGUED]**
Eric Konopka
Latham & Watkins
555 11th Street NW
Suite 1000
Washington, DC 20004

Nikita Kansra
Latham & Watkins
1271 Avenue of the Americas

New York, NY 10020

John W. Schmehl
DILWORTH PAXSON LLP
1500 Market Street
Suite 3500E
Philadelphia, PA 19102

      Counsel for Appellants

Julie C. Avetta **[ARGUED]**
Ivan C. Dale
Jennifer M. Rubin
United States Department of Justice
Tax Division
950 Pennsylvania Avenue NW
P.O. Box 502
Washington, DC 20044

      Counsel for Appellee

_____

OPINION OF THE COURT

_____

CHUNG, Circuit Judge.

Federal tax law distinguishes between ordinary income and capital gains, generally taxing the latter at lower levels. Accordingly, it may be preferable for taxpayers to characterize interest earnings as capital gains when possible. Section 483 of the Internal Revenue Code restricts which earnings taxpayers can classify as capital gains. The Charles G.

Berwind Trust for David M. Berwind (the "DB Trust") appeals the Tax Court's decision that Section 483 required part of a 2002 settlement payment to be characterized as interest, taxable at ordinary-income levels. We will affirm the Tax Court's decision.

## I.        BACKGROUND

### A.        Corporate History, Litigation, and Settlement

Founded in 1883, the Berwind Corporation was a closely held coal mining business owned by Charles G. Berwind, Sr. In 1963, Charles established trusts for each of his four children, including Graham and David. Combined, these trusts owned the full common stock of the Berwind Corporation. Over time, Graham Berwind sought to "consolidate the ownership of Berwind Corporation." App. at 9. By 1976, only two of the trusts continued to hold interests in the Berwind Corporation, the Graham Berwind Trust ("GB Trust") and the DB Trust.

In 1978, the Berwind Corporation acquired a separate company, Colorcon, Inc., which specialized in pharmaceutical coatings. The Berwind Corporation formed Berwind Pharmaceutical Services, Inc. ("BPSI") as a vehicle to own Colorcon's common stock. From that point forward, many actions affecting corporate structure were taken, including 1) the elimination of the DB Trust's ownership interest in the Berwind Corporation; and 2) the transfer of part of the GB Trust's BPSI interests to trusts held by Graham Berwind's children.

4

In 1990, the GB Trust and the trusts held by his children contributed their interests in the Berwind Corporation and BPSI to a separate corporate entity, Berwind Group Partners. The DB Trust held no interest in Berwind Group Partners but continued to have an ownership interest in BPSI.

Beginning in the 1990s, Berwind Group Partners sought to acquire or redeem the DB Trust's ownership interest in BPSI. After the DB Trust rejected multiple offers, the effort to eliminate the DB Trust's shares escalated. In August 1999, the President of the Berwind Corporation sent a letter to the DB Trust stating that BPSI hoped to negotiate a mutually satisfactory purchase but was "prepared to start a process that will result in our ownership of 100% of BPSI at a price to be determined by us and our financial advisors." App. at 22. It continued: "If we don't hear from you by September 7, 1999, we will start down our path with the intention of completing a transaction by year end." *Id.* (brackets omitted).

Section 1924(b)(1)(ii) of the Pennsylvania Business Corporation Law ("BCL") provided a mechanism to execute their intent, allowing for "short-form" mergers. Per that BCL section, a parent corporation could merge with its 80%-owned subsidiary without a vote by the subsidiary's shareholders. BCL § 1924(b)(1)(ii).[1]

In November 1999, concerned that the DB Trust would be deprived of its stake in BPSI, four of its trustees filed a

---

[1] Citations to the BCL are to the section numbers in effect at the relevant time. The BCL was subsequently amended and renumbered.

lawsuit in the Eastern District of Pennsylvania against the Berwind Corporation, Berwind Group Partners, BPSI's directors, Graham Berwind, and Bruce McKenney, an officer of the Berwind Corporation. *See Warden v. McLelland*, No. 2:99-cv-05797 (E.D. Pa.) (the "*Warden* litigation").

On December 15, 1999, despite the *Warden* lawsuit, Berwind Group Partners and the Berwind Corporation took three steps to effectuate a short-form merger between BPSI and a newly created parent company, BPSI Acquisition. First, Berwind Group Partners and the Berwind Corporation contributed their BPSI stock to BPSI Acquisition Corporation, giving it control of 83.6% of BPSI's common stock (with 16.4% still owned by the DB Trust). Second, BPSI issued notices to redeem all of the then-outstanding classes of BPSI preferred, preference, and preferential stock[2] (common stock was unaffected by the redemption). Third, BPSI Acquisition's board of directors and BPSI's board of directors approved a short-form merger plan under which BPSI Acquisition would merge into BPSI (the "Merger Agreement"), with BPSI as the sole surviving corporation. The Merger Agreement provided for the following treatment of any common stock of BPSI and BPSI Acquisition outstanding at the time of merger:

---

[2] The DB Trust owned 13.12% of preferential shares and no preferred or preference shares. Berwind Group Partners owned 66.88%, and Graham Berwind owned 2%, of the preferential shares. The Berwind Corporation, wholly owned by the Berwind Group Partners, owned 100% of the preferred and preference shares.

6

- Each share of BPSI Acquisition common stock "shall be converted into one share of common stock of [BPSI]." App. at 515.

- Shares of BPSI common stock owned by BPSI Acquisition "shall be cancelled." *Id.*

- Any remining shares of BPSI common stock, i.e., those held by the DB Trust, "shall be converted into the right to receive a subordinated promissory note" valued at $82,820,000, due in a single payment two years later, on December 15, 2001, with interest accruing at 10%. *Id.* at 515, 520.

The Merger Agreement also stated that the DB Trust's preferential shares were redeemed, were "no longer deemed outstanding, and have no rights with respect to the [merger]." App. at 513. It further noted in a later provision that the DB Trust had dissenters' rights under provisions of Pennsylvania law and could "obtain payment of the fair value of their shares" in BPSI.[3] App. at 515. The Merger Agreement was executed by one officer from BPSI Acquisition and one officer from BPSI. As a minority shareholder of BPSI, the DB Trust was not entitled to vote on the Merger Agreement per the BCL's short-form merger provision. The following chart from the Tax Court opinion illustrates the corporate structure on December 15, 1999, immediately prior to the execution of the merger:

---

[3] Because the DB Trust exercised its dissenters' rights, the $82.8 million promissory note ultimately did not issue.

7



App. at 47.

On December 16, 1999, BPSI filed the articles of merger and the Merger Agreement with the Pennsylvania Secretary of State.

8

On January 4, 2000, the plaintiffs in the *Warden* litigation filed an amended complaint with thirteen counts. Most of the claims challenged the validity of, or were related to, the merger in some form or another, including a demand for statutory appraisal under Pennsylvania's dissenters' rights provision. But some of the claims asserted that Graham Berwind and Bruce McKenny violated their fiduciary duties to BPSI and the DB Trust by allowing BPSI to loan funds for, but not take part in, the purchase of another company, Zymark.

As a "precautionary measure," the DB Trust also exercised its dissenters' rights by bringing an action in Orphans' Court. App. at 55. As BPSI and the DB Trust did not agree on the value of the shares, BPSI filed its own state court appraisal action for a judicial determination of the shares. The appraisal action was ultimately removed to the Eastern District of Pennsylvania and consolidated with the *Warden* litigation. The dissenters' rights action remained in Orphans' Court.

After several months of negotiation, the parties settled the *Warden* litigation in November 2002 (the "Settlement Agreement"). The preamble to the Settlement Agreement acknowledged the parties' ongoing dispute about the validity of the merger and whether the Merger Agreement effected a sale of the DB Trust's BPSI shares in 1999. Despite these differences, the Settlement Agreement set forth the terms upon which the parties agreed to resolve the *Warden* litigation. The Settlement Agreement required the DB Trust to deliver in escrow, among other items, its BPSI stock certificates and a stipulation of dismissal for the *Warden* litigation. In exchange, BPSI agreed to pay the DB Trust $191,000,000 (the "Settlement Amount"), also held in escrow. An escrow agent

would effectuate these transfers if, among other things, the Orphans' Court approved the settlement.

The Orphans' Court eventually approved the settlement and, on December 31, 2002, the escrow agent released the $191 million Settlement Amount to the DB Trust. The consolidated *Warden* action was dismissed shortly thereafter.

## B. Tax Dispute

A tax dispute remained following settlement. Section 483 of the Tax Code imputes interest to a payment when, among other things, the payment is "under [a] contract for the sale or exchange of any property,"[4] and when the contract provides for deferred payments, as to which there is "unstated interest." 26 U.S.C. § 483(a), (c). In BPSI's view (shared here by the IRS), the Settlement Amount was a deferred payment for the purchase of the DB Trust's shares in BPSI "under" the Merger Agreement in 1999 for purposes of Section 483(a)(1). According to BPSI, the 2002 Settlement Agreement only had the effect of determining the share price for purposes of that agreement. This position meant that the DB Trust would be stuck with characterizing part of the Settlement Amount as interest, and thus, income to the DB Trust for tax purposes. The DB Trust unsurprisingly took the position that the Settlement Amount was payment "under" the 2002 Settlement Agreement and that its shares were sold at that time. This position meant that no portion of the Settlement Amount would be characterized as interest, and hence, it would be wholly taxed as capital gains earned by the DB Trust. This tax dispute

---

[4]     For ease, we shall refer to this as a "contract for the sale of property."

10

was foreseen by the parties at the time of settlement and the parties prepared their taxes for 2002 according to their respective positions.

The IRS audited both returns and issued deficiency notices to both BPSI and the DB Trust, spawning parallel litigation between the IRS and the parties.[5]  The deficiency notices sent to the DB Trust and its beneficiaries determined that part of the Settlement Amount represented unstated interest income and under Section 483 was taxable as ordinary income.  The DB Trust filed the instant Tax Court petition for a redetermination of the deficiencies.  The Tax Court continued the case for several years, held a trial in 2016, and ruled for the IRS in an opinion filed in December 2023.  The Tax Court concluded that the December 16, 1999, merger constituted a sale of the DB Trust's shares for purposes of Section 483.  App. at 101.  The Tax Court rejected the DB Trust's argument that the merger agreement was void as having violated BPSI's articles of incorporation or Pennsylvania law.  The Tax Court accordingly concluded that BPSI made the $191 million settlement payment "under" the 1999 Merger Agreement to satisfy its obligation to pay for the DB Trust's BPSI shares.  *Id.* at 135. The Tax Court also concluded that the Merger Agreement was a "contract" for the sale or exchange of the DB Trust's BPSI shares, irrespective of whether the DB Trust itself assented to the sale.  *Id.* (quoting 26 U.S.C. § 483(a)(1), (c)(1)).

The Tax Court entered a final decision holding the DB Trust liable for taxes owed on approximately $31 million of

---

[5]     The Commissioner is permitted to take inconsistent positions in deficiency notices to ensure recovery.  *Gerardo v. C.I.R.*, 552 F.2d 549, 555 (3d Cir. 1977).

11

ordinary income that it deemed was the interest portion of the $191 million Settlement Amount. The DB Trust and its beneficiaries timely appealed to this Court.

II.    DISCUSSION[6]

We "review the Tax Court's legal conclusions, including its interpretation of the Internal Revenue Code and associated regulations, de novo." *Mylan Inc. v. C.I.R.*, 76 F.4th 230, 242 n.18 (3d Cir. 2023). The Tax Court's factual findings are reviewed for clear error. *Id.* A factual finding is clearly erroneous if it is "unsupported by substantial evidence, lack[s] adequate evidentiary support in the record," or goes "against the clear weight of the evidence." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 726 F.3d 403, 416 (3d Cir. 2013) (quoting *United States v. 6.45 Acres of Land*, 409 F.3d 139, 145 n.10 (3d Cir. 2005)).

Tax law distinguishes between capital gains and ordinary income, the latter of which includes income generated by interest. *See Lattera v. C.I.R.*, 437 F.3d 399, 402-03, 406 (3d Cir. 2006). Capital gains are often taxed at lower rates than ordinary income. *Id.* at 403. Accordingly, taxpayers sometimes prefer to characterize income as capital gains rather than ordinary income.

Prior to the enactment of 26 U.S.C. § 483, taxpayers could "convert what is in reality ordinary interest income into capital gain" by agreeing to sell property in exchange for

---

[6]    The Tax Court had jurisdiction under 26 U.S.C. §§ 6213, 6214, and 7442. We have jurisdiction to review final decisions of the Tax Court under 26 U.S.C. § 7482(a)(1).

12

payments made over time without "specifically provid[ing] for interest payments[.]" S. Rep. No. 88-830, at \*1771, \*1775 (1964). Such payments would then be taxed as capital gains without any portion attributed to ordinary-income interest. *Id.* "[I]n enacting section 483, Congress intended primarily to prevent taxpayers from converting ordinary income to capital gain" where "the dollar amount of the deferred payments was larger than it would have been had payment been made immediately." *Vorbleski v. C.I.R.*, 589 F.2d 123, 134 (3d Cir. 1978); *see also Schusterman v. United States*, 63 F.3d 986, 990 (10th Cir. 1995) ("Section 483 [e]nsures that a taxpayer does not avoid income taxes by structuring an installment contract to provide only for the payment of principal (taxed as capital gains) without interest (taxed as ordinary income).").

Subsections (a) and (c) describe the circumstances in which Section 483 applies. Section 483(a) provides that "in the case of any payment (1) under any contract for the sale or exchange of any property, and (2) to which this section applies," interest shall be imputed. Section 483(c)(1), in turn, provides that Section 483 applies

> to any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract—
> (A) under which some or all of the payments are due more than one year after the date of such sale or exchange, and
> (B) under which there is total unstated interest.

13

Following the parties, we break this statutory language down into four conditions that must be met in order for Section 483 to apply:

- There is a payment "under any contract for the sale or exchange of any property." 26 U.S.C. § 483(a).

- That payment is made "on account of the sale or exchange of property," "constitutes part or all of the sales price" of the property, and is "due more than 6 months after the date of such sale or exchange." *Id.* § 483(c)(1).

- "[S]ome or all of the payments" under the contract are "due more than 1 year after the date of the sale or exchange." *Id.* § 483(c)(1)(A).

- There is "total unstated interest" under the contract as measured against rates determined by the IRS. *Id.* § 483(b).

When these conditions are satisfied, Section 483 requires that the "unstated interest" that "is properly allocable to such payment" "be treated as interest" for tax purposes. *Id.* § 483(a). Tax law provides a formula—not relevant here—for determining the amount of "unstated interest" allocable to a particular sale. *See* 26 U.S.C. § 1274.

The government contends that the $191 million payment, made in 2002, satisfies all four requirements. Most relevant here, the government argues that the payment was made "under" the 1999 Merger Agreement because that

14

instrument extinguished the DB Trust's shares and obligated BPSI to pay a redemption price for those shares.

The DB Trust disagrees with the government's framing. Broadly speaking, it makes two arguments in response. First, it asserts that BPSI made the $191 million payment "under" the 2002 Settlement Agreement because that was the instrument "that expressly provided for the payment[] in redemption of the Trust's BPSI stock." Br. at 24. This is in essence an argument that the sale took place in 2002. Second, it contends that even if the Settlement Amount were a deferred payment made for a 1999 sale or exchange, the 1999 Merger Agreement is not a "contract" capable of triggering Section 483. *Id.*

We agree with the government that the $191 million payment was made "under" the 1999 Merger Agreement and that the Merger Agreement was a "contract" for purposes of triggering Section 483.

## A. The Sale of the DB Trust's Shares Occurred in 1999

Our review of the Tax Court's legal conclusions will depend on a critical factual finding that we review for clear error: when DB Trust's 16.4% ownership interest in BPSI was sold. We review any necessary legal conclusions de novo. The Tax Court found that this sale occurred in 1999. We perceive no legal errors and conclude that this finding was not clearly erroneous.

BCL Section 1928 provided, in relevant part, that "[u]pon the filing of the articles of merger … in the Department of State … the merger or consolidation shall be effective."

15

Here, BPSI filed the articles of merger with the Secretary of State of Pennsylvania on December 16, 1999. The articles of merger stated that BPSI "had merged with BPSI Acquisition and that the surviving corporation was BPSI." App. at 50. Accordingly, the Tax Court concluded that the merger was completed, and the sale of the DB Trust's shares was effected on that date.

The DB Trust asserts that the 1999 merger was void *ab initio* because the merger violated the BCL and violated BPSI's own articles of incorporation. We disagree.[7]

1. The Tax Court did not Err in Rejecting the DB Trust's Argument that the Merger did not Violate the BCL

The DB Trust first argues that the 1999 Merger Agreement is void because it failed to comply with BCL

---

[7] It is not clear to us that such violations render a merger void in the absence of a court order to that effect. Although the Pennsylvania Supreme Court has not passed on this precise issue, it has held that a corporate sale of property which violated the BCL was *voidable* by court order, not void *ab initio*. *Fishkin v. Hi-Acres, Inc.*, 341 A.2d 95, 98 (Pa. 1975) (noting "no public interest of substance [was] jeopardized by a transfer not in compliance with the statute" and that "it is sufficient to protect the rights of minority shareholders that a non-conforming transfer be deemed *voidable* (under proper circumstances) by an aggrieved stockholder, rather than void Ab initio" (emphasis added)). We need not predict how the Pennsylvania Supreme Court would resolve this question, as we conclude that there was no violation of the BCL.

16

§ 1922(a)(3), which requires a plan or merger to "set[] forth … [t]he manner and basis of converting the shares of each corporation into shares or other securities … of" BPSI ("terms of conversion requirement").  That is, Section 1922(a)(3) required the 1999 Merger Agreement to state what preferential stockholders would "receive in exchange … for such shares." *Id.*

Prior to the merger, the DB Trust owned 13.12% of preferential stock, a class of BPSI's preferred stock.  On December 15, 1999, BPSI sent a redemption notice to holders of preferential stock and also filed Articles of Merger with the Pennsylvania Department of State.  The notice informed preferential shareholders that their shares were being redeemed at a price of $1 per share and that BPSI had irrevocably deposited funds sufficient for those redemptions.  The Merger Agreement, filed the following day on December 16, 1999, provided that Berwind "previously issued notices of redemption for the outstanding shares of … Series A Preferential Stock and deposited a sum sufficient to pay the redemption price."  App. at 513.  The Merger Agreement further specified that the "par value" of each share of preferential stock was $1.  *Id.*  The Tax Court did not err in concluding that this "set[s] forth … [t]he manner and basis of converting the [preferential] shares of" BPSI as required by the BCL.  BCL § 1922(a)(3).

The DB Trust argues that this provision of the Merger Agreement was inadequate because the Merger Agreement erroneously stated the DB Trust's preferential shares were "no longer deemed outstanding, and have no rights with respect to the [merger]."  App. at 513.  The DB Trust correctly notes that these shares actually remained outstanding until January 15,

17

2000. The DB Trust argues that the 1999 Merger Agreement should thus have stated what preferential stockholders would "receive in exchange … for such shares" in the future. BCL § 1922(a)(3).

We reject this argument. Even though the 1999 Merger Agreement erroneously stated that the redemption had been completed and that the DB Trust's preferential shares were no longer outstanding as of December 15, 1999, the plan of merger nonetheless "set forth" that the preferential shares would be redeemed for $1 per share. This accurately stated "[t]he manner and basis of converting" the DB Trust's preferential shares. Therefore, the Tax Court did not err in holding that the Agreement complied with BCL § 1922(a)(3).

      2.      <u>The Tax Court did not Err in Rejecting the DB Trust's Argument that the Merger did not Violate BPSI's Articles of Incorporation</u>

The DB Trust's second argument for voiding the merger fares no better. It contends that the 1999 merger is void because it "was not subject to a shareholder vote as required by BPSI's articles of incorporation." Br. at 47. BPSI's articles of incorporation prohibited BPSI from merging with another corporation without "consent [] given by vote … of the holders of at least a majority of the total number of shares of the Preferred Stock of all series then outstanding" unless that stock "shall continue … to be authorized and outstanding after such merger" or was converted into preferred stock with "comparable rights and preferences." App. at 414. This boils down to an argument that BPSI Acquisition, as the only holder

18

of BPSI Preferred Stock, was deprived of its opportunity to vote on the merger as a shareholder of BPSI.[8]

The Tax Court rejected this argument. It concluded that "the record [did] not establish whether BPSI Acquisition submitted a vote as the sole holder of BPSI's preferred stock." App. at 107. Because the DB Trust had the burden of proof in this matter, the Tax Court "[r]esolv[ed] this factual issue against" it. *Id.* at 108. We see no clear error in the Tax Court's conclusion. *See Anderson v. C.I.R.*, 698 F.3d 160, 164 (3d Cir. 2012) (factual findings of the tax court are reviewed for clear error). The DB Trust produced no evidence suggesting that BPSI Acquisition did not vote as a shareholder for the merger. At most, it asserts that because the "plan of merger provided that the holders had 'no rights' with respect to the plan," it "follows that no such vote took place." Br. at 48. That syllogism does not surmount the clear-error hurdle. Even if we concluded that the BPSI Acquisition failed to hold the required vote and that such a failure violated BPSI's articles of incorporation, we are not persuaded that the merger would be void *ab initio*.[9]

---

[8]    BPSI had three types of preferred stock, "Preferred Stock," "Preference Stock," and "Preferential Stock." The DB Trust and others held Preferential Stock. Only BPSI Acquisition held "Preferred Stock" as referenced by the BPSI Articles of Incorporation.

[9]    Aside from the lack of clear error, this argument is unpersuasive because BPSI Acquisition's board of directors unanimously consented to the merger. As a matter of common sense, that consent would be functionally equivalent to a "vote" by BPSI Acquisition's board, acting as holders of

19

In light of the foregoing, we find no clear error in the Tax Court's ultimate finding that the sale of the DB Trust's shares occurred in 1999 per the Merger Agreement.

### B. The Merger Agreement was a Contract for Sale of the DB Trust's Shares

As set forth above, Section 483 applies when, among other things, there is a payment "under any contract for the sale or exchange of any property." 26 U.S.C. § 483(a). The DB Trust asserts that the Merger Agreement is not a contract. We again disagree.

The Merger Agreement was executed by BPSI Acquisition and BPSI and was approved by both of those corporations' boards of directors. Accordingly, there were two assenting parties to the merger, which became effective when filed with the Pennsylvania Department of State on December 16, 1999. *See* BCL § 1928. At that time and as fully set forth above, the Merger Agreement effected the sale of the DB Trust's shares and mandated a payment in exchange for that

---

Preferred Stock, to approve the merger. *See* App. at 414-15. Even if such a technical difference were a violation of BPSI's Articles of Corporation, we are skeptical that that meaningless distinction would render the merger void. *See In re Jones & Laughlin Steel Corp.*, 412 A.2d 1099, 1103 (Pa. 1980) (no injunctive remedies for merger unless petitioner shows "fraud or fundamental unfairness") (citing BCL § 1105); *Barter v. Diodoardo*, 771 A.2d 835, 839-41 (Pa. Super. Ct. 2001) ("fraud or fundamental unfairness" requires a showing of materiality).

20

redemption. That enforceable agreement—assented to by two parties and recognized by law—constitutes a contract and the DB Trust's common shares were sold pursuant to that contract. *See* App. at 515 (providing that the DB Trust's shares "shall be converted into the right to receive a subordinated promissory note … of $82,820,000[]").

We reject the DB Trust's contention that, because *it* did not assent to the merger, "[t]he contested plan of merger was not a contract [for the sale of the DB Trust's property]." Br. at 42 (internal quotations omitted); *see* 26 U.S.C. § 483(a)(1). The DB Trust's assent to the merger was not necessary for the formation of a contract for the sale of its shares. As a minority, dissenting shareholder, the DB Trust was bound to the agreement made by BPSI and BPSI Acquisition. *See* Am. Jur. Corporations § 635 ("The holders of the majority of the stock of a corporation have the power, by the election of directors and the vote of their stock, to do everything that the corporation can do."). Indeed, "[t]he majority stockholders have the right to determine the policy to be pursued and to manage and direct the corporation's affairs, and the minority must submit to their judgment." *Id.*; *see also Helvering v. Hammel*, 311 U.S. 504, 510 (1941) (recognizing, under a different federal tax law, that there is "no basis" to distinguish "forced sales [from] voluntary sales"); *Vorbleski*, 589 F.2d at 126; *Solomon v. C.I.R.*, 570 F.2d 28 (2d Cir. 1977); *Katkin v. C.I.R.*, 570 F.2d 139 (6th Cir. 1978); *Jeffers v. United States*, 556 F.2d 986 (Ct. Cl. 1977). Under the BCL, BPSI—as a separate legal entity from its shareholders, including the DB Trust—had the statutory authority to convert its common shares into the right to receive payment and engage in the short-form merger used here. BCL § 1924(b)(1)(ii) ("[A] plan of merger or consolidation shall not require the approval of the shareholders of a constituent

21

domestic business corporation if … another corporation that is a party to the plan owns … 80% or more of the outstanding shares of each class of the constituent corporation."); *see Dole Food Co. v. Patrickson*, 538 U.S. 468, 474-75 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities.").

The DB Trust primarily relies on *Tribune Publishing Co. v. United States*, 836 F.2d 1176 (9th Cir. 1988), to assert the proposition that a seller must have voluntarily entered into a contract for Section 483 to apply. First, the plain text of Section 483 does not impose such a requirement, 26 U.S.C. § 483, nor does the term "contract" (as we have explained above). Second, *Tribune* is not binding here and, in any case, does not support this argument. There, Tribune sued Boise Cascade in relation to a 1969 merger and settled that suit in 1977. *Tribune*, 836 F.2d at 1177. The Ninth Circuit concluded that Section 483 did not apply to the 1977 settlement payment, stating, among other things, that "Tribune did not voluntarily contract to exchange its Newsprint stock for Boise Cascade stock plus [the settlement proceeds]." *Id.* at 1181. The DB Trust argues that *Tribune* thus clarifies that Section 483 only applies when a shareholder's stock is sold voluntarily. In our view, the Court in *Tribune* was simply communicating that the parties "did not voluntarily contract [in 1969] to exchange its Newsprint stock for Boise Cascade stock [in 1969] plus [the settlement proceeds in 1977]." *Id.* Therefore, this was simply a holding that the settlement payment there was not "under" that original 1969 merger agreement that in no way turned upon whether or not there was a voluntary sale. *Id.*[10]

---

[10] In contrast, the Merger Agreement here did contemplate monetary payment to the DB Trust for its shares. While the

22

Accordingly, the Tax Court did not err in rejecting this argument.

In sum, as an agreement between two parties which effected the sale of the DB Trust's shares, the Merger Agreement is a "contract for the sale of property" per Section 483.

### C.      The $191 Million Settlement Amount was Made "Under" the 1999 Merger Agreement

#### 1.      Section 483 Applies to Any Payment "Under" Any Contract

Not only must there be a "contract for the sale of property" in order to impute interest to a payment under Section 483, but the payment must also be "under" that contract.  26 U.S.C. § 483(a)(1).  To determine whether this condition is satisfied, we must first decide which agreement—the Merger Agreement or the Settlement Agreement—the $191 million Settlement Amount was made "under."  *Id.*

The word "under" has many meanings.  In considering the analogous phrase "pursuant to" in a non-tax statute, the Supreme Court noted that when used in the legal context, "under" "identifies the provision that served as the basis for the [conduct]." *Harrow v. Dep't of Def.*, 601 U.S. 480, 486 (2025).  Similarly, we contemplated the meaning of "under" in the phrase "under a plan confirmed" in a bankruptcy statute and noted that "[w]hen an action is said to be taken 'under' a

terms of that payment were negotiated later, *see infra* at 24, the fact of monetary payment was part of the Merger Agreement.

23

provision of law or a document having legal effect, what is generally meant is that the action is 'authorized' by the provision of law or legal document." *In re Hechinger Inv. Co. of Del., Inc.*, 335 F.3d 243, 252 (3d Cir. 2003). We concluded that the statutory phrase "under the plan confirmed" meant that the transfers in question had to have been "authorized" by a confirmed bankruptcy plan. *Id.* That interpretation was similar to, and consistent with, *Harrow*'s definition of "under."

Adopting a similar definition here makes sense for the same reasons and also in reading Section 483 as a whole. Specifically, Section 483(c) states, in part, that it applies "to any payment *on account* of the sale or exchange of property." 26 U.S.C. § 483(c)(1) (emphasis added). This language signals that Section 483 applies when the payment is "on account of the [contracted] sale." *Id.* Thus, for purposes of Section 483, a payment is "under" a contract when the contract serves as the basis for, or authorizes, the sale of property.

2.    The Settlement Amount was a Payment Under the Merger Agreement

In our view, the Merger Agreement "served as the basis for payment" of the DB Trust's shares, and thus the Settlement Amount payment was "under" that agreement. *See Harrow*, 601 U.S. at 486. We are led to this conclusion for two reasons. First, as noted above, the Merger Agreement was the instrument that effected the sale of the DB Trust's shares and mandated payment for those shares. BPSI incurred its obligation to pay for those shares when the articles of merger were filed with the Secretary of State on December 16, 1999, extinguishing the DB Trust's shares in BPSI. *See Seven Springs Farm, Inc. v. Croker*, 748 A.2d 740, 748 (Pa. Super.

24

Ct. 2000) (stating that "merger is a corporate act that, by operation of law, results in extinction of the constituent corporation's stock"). It was therefore the 1999 sale that created the payment obligation, *i.e.*, "served as the basis for," and "authorized," BPSI to pay the DB Trust. *Harrow,* 601 U.S. at 486; *In re Hechinger*, 335 F.3d at 252. In contrast, the Settlement Agreement took great pains to specify that it did *not* constitute an agreement to sell the DB Trust shares. Rather, the Settlement Agreement expressly stated that there was an ongoing dispute as to when those shares were sold. And, as we have discussed above, Pennsylvania state law settles that question and gave the Merger Agreement full effect in 1999.

Second, the DB Trust does not dispute that the 2002 Settlement Amount paid "for" the DB Trust's shares. *See* Reply at 16 ("It is true … that the $191 million payment was paid for the Trust's BPSI stock." (internal quotations omitted)). The Settlement Agreement provided for the dismissal of all claims in both the federal *Warden* litigation and Orphans' Court suit. Although the DB Trust asserted claims in the *Warden* litigation unrelated to the sale of its shares and dismissed those claims per the Settlement Agreement, the DB Trust concedes that the Settlement Amount was wholly paid to fulfill BPSI's obligation to compensate the DB Trust for its shares. *See id.* This supports the conclusion that the payment was made "under" the Merger Agreement, the instrument which imposed the payment obligation.

3. The Merger Agreement Served as the Basis for the Payment while the Settlement Agreement Specified the Terms of that Payment

The DB Trust resists this conclusion by arguing that the 2002 Settlement Agreement "explicitly mandated" payment of the Settlement Amount and accordingly, payment was made "under" that later agreement. Br. at 26-28. This is an attractive, common-sense interpretation of Section 483 and its application. *See* 26 U.S.C. § 483(c). The Settlement Agreement is a contract and sets forth the amount and timing of the payment for the DB Trust's shares. Thus, the Settlement Amount is, at the very least, a payment under a contract, if not a payment under a contract for the sale of property.

Adopting this narrow interpretation of the statutory language and applying it to the facts here would mean that taxpayers could evade the application of Section 483 simply by creating two contracts, one for the sale of property with an undefined term of payment and one defining the terms of payment. In that situation, the "payment" is technically not "under any contract for the sale of property," it is "under a contract for the payment for the sale of property." We decline to adopt this reading as contrary to the text of Section 483(a)(1). *See Harrow,* 601 U.S. at 486 (explaining that "under" "identif[ies] the provision that served as the basis" for the relevant action); *In re Hechinger*, 335 F.3d at 252 ("When an action is said to be taken 'under' a provision of law or a document having legal effect, what is generally meant is that the action is 'authorized' by the provision of law or legal document."). And as noted above, that reading is also inconsistent when reading Section 483 as a whole, which specifies in subsection (c) that the section applies to "any payment on account of the sale or exchange of property." The

26

Settlement Amount surely meets that condition.[11]

Pennsylvania state law governs our interpretation of each contract, and by extension, whether the terms of either contract indeed supply the basis for the payment.[12] The DB Trust's shares were sold in 1999, per the Merger Agreement, and the DB Trust rejected the price set forth in that agreement. Having exercised its dissenters' rights to seek a fair value for its shares, the note authorizing the original $82.8 million payment from BPSI never issued. And, while the sale was effected, the price to be paid for the DB Trust's shares

---

[11] This reading is also inconsistent with the very reason for the enactment of Section 483. See S. Rep. No. 88-830, at *1771, *1775 (1964); *Vorbleski*, 589 F.2d at 134 (explaining that, "in enacting section 483, Congress intended primarily to prevent taxpayers from converting ordinary income to capital gain" through the clever drafting of sale contracts); *Schusterman*, 63 F.3d at 990 ("Section 483 [e]nsures that a taxpayer does not avoid income taxes by structuring an installment contract to provide only for the payment of principal (taxed as capital gains) without interest (taxed as ordinary income).").

[12] Pennsylvania law controls our interpretation of both the Merger Agreement and the Settlement Agreement. *See DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 54 (2015) ("[T]he interpretation of a contract is ordinarily a matter of state law to which we defer."); *see also Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (noting that settlement agreements are a form of contract); *Lesko v. Frankford Hosp. Bucks Cnty.*, 15 A.3d 337, 341-42 (Pa. 2011) ("[W]e note [that] settlement agreements are governed by contract law principles.").

remained to be determined. Under Pennsylvania law, the lack of a definite price term does not invalidate an otherwise valid contract. *Cf. Greene v. Oliver Realty, Inc.*, 526 A.2d 1192, 1194 (Pa. 1987) ("If an essential term is left out of the agreement, the law will not invalidate the contract but will include a reasonable term. For instance, if the parties do not specify price, a court will impose a reasonable price which will usually be the item's market value."). We acknowledge that this strand of Pennsylvania case law is not directly on point because the Merger Agreement did specify a price for the DB Trust's shares and there was no missing term. The complication here is that this definite term was later contested by a non-party to the Merger Agreement. Moreover, the parties who entered into the Merger Agreement (between BPSI and BPSI Acquisition) are different than those who entered into the Settlement Agreement (the various trusts and their beneficiaries, the successor to Berwind Group Partners, Berwind Corp, and BPSI). Nonetheless, under the BCL, the sale occurred and the Merger Agreement is valid. Thus, Pennsylvania law suggests that the missing or disputed price term could be supplied later. The Settlement Agreement did just that (although three years after the sale was completed). In other words, although the Settlement Agreement supplied the missing terms of payment, the Merger Agreement "provided the basis" for the fact of that payment.

### 4. The Timing of the Valuation is Irrelevant

The DB Trust next argues that payment was not under the Merger Agreement because the negotiators intended that the Settlement Agreement set forth the DB Trust's shares based on a 2002 valuation—meaning the price of the shares in 2002 without any portion of the Settlement Amount to account for

interest accrued from 1999. Br. at 28-29. This is just another way for the DB Trust to argue that its shares were sold in 2002. As noted above, however, the Settlement Agreement affirmatively states that it does not resolve that issue and Pennsylvania law resolves it against the DB Trust's position.[13]

---

[13] In 1996, Berwind Group Partners formed ZYAC Holding Corporation to acquire Zymark Corporation. To finance ZYAC Holding's purchase of Zymark, BPSI loaned $20 million to ZYAC Holding in exchange for an interest-bearing note. In connection with ZYAC Holding's acquisition of Zymark, BPSI purchased 1,000 shares of ZYAC Series A preferred stock for $10 million. The DB Trust asserts that the $191 million settlement represented "the value of BPSI *and* Zymark" to the DB Trust. Br. at 28. In its view, because the 2002 Settlement Amount included a valuation of Zymark— and because the Settlement Agreement included a "ride-up" payment based on the future increases in the value of BPSI and Zymark—the payment must have been made "under" that 2002 Agreement. We are not persuaded. In both 1999 and 2002, BPSI owned ZYAC preferred stock and a valuation of BPSI at any time would necessarily include the value of that stock to BPSI. Nor does the existence of a ride-up payment affect the outcome we reach. Whether or not *additional* payments might be required in the future does not alter the fact that the Settlement Amount was paid "on account of" the 1999 sale of the DB Trust's shares. 26 U.S.C. § 483(c)(1); *see, e.g.*, 26 C.F.R. § 1.483-4 (addressing treatment of deferred contingent payments when the "overall contract" is subject to Section 483).

5. The Origin-of-the-Claim Doctrine is Unavailing Here

Finally, the DB Trust argues that the origin-of-the-claim doctrine and *Lyeth v. Hoey*, 305 U.S. 188 (1938), support the conclusion that the payment was made under the 2002 Settlement Agreement.[14] The origin-of-the-claim doctrine functions to determine whether a settlement payment should be characterized as capital gain or ordinary income. *See Francisco v. United States*, 267 F.3d 303, 319 (3d Cir. 2001) ("It is a tenet of federal tax law that income received in settlement of a claim should be taxed in the same manner as if it had been received on that claim in court."). To correctly identify that tax characterization, courts hypothesize that the taxed person won the settled claim and consider the "'nature' of the 'right compromised.'" *Freda v. C.I.R.*, 656 F.3d 570, 574 (7th Cir. 2011) (quoting *Nahey v. C.I.R.*, 196 F.3d 866, 868 (7th Cir. 1999)).

---

[14] While the DB Trust does assert that Section 483's other requirements are not met, its challenge to those conditions is based on the same unsuccessful argument that the sale of its shares took place in 2002, not 1999. The only other argument that the DB Trust asserted was not timely raised. In its Reply Brief, the DB Trust argued that the Merger Agreement adequately stated interest so that, even if payment of the Settlement Amount were made under the Merger Agreement, Section 483 does not apply. As it failed to raise that argument in its opening brief, we decline to address it as forfeited. *See In re Wettach*, 811 F.3d 99, 115 (3d Cir. 2016) (failure to develop arguments in opening brief results in forfeiture of those arguments).

The DB Trust argues that, as viewed through the lens of this doctrine, "the $191 million settlement payment was made 'in lieu of' all of" the claims for relief asserted in the *Warden* litigation. Br. at 29-31. In other words, the DB Trust wants us to indulge in the fantasy that the Settlement Amount was paid to settle all of the *Warden* claims, despite the reality that the $191 million payment was wholly made "for the Trust's BPSI stock." Reply at 16. We decline to do so. The "nature" of the payment is not in dispute – it is payment for stock. What *is* in dispute is whether any portion of that payment should be imputed to interest. The answer to that question turns not on the nature of the payment, but on its timing; specifically, whether it was made more than a year after the sale of the DB Trust's stock. *See* Br. at 31 (the DB Trust arguing that we must assume the DB Trust retained its shares "until the [DB] Trust voluntarily agreed to sell them [in 2002]"). As the origin-of-the-claim doctrine does not answer that question, this argument too fails.

### III.    CONCLUSION

In sum, the $191 million payment had no stated interest and was (1) paid "under" the 1999 Merger Agreement, which (2) was a "contract" (3) for the "sale or exchange" of the DB Trust's shares in 1999. BPSI made the payment when it was due in 2002, "on account of [that] sale[.]" Accordingly, Section 483 applies to that 2002 payment. For the reasons set forth above, we will affirm the judgment of the Tax Court.